Succession of Conrad.

No. 10,878.

IN THE MATTER OF THE SUCCESSION OF MARY CLARK CONRAD, DE-CEASED WIDOW OF DAVID WEEKS, SR., AND DECEASED WIFE OF JOHN MOORE, DECEASED.

OPPOSITIONS TO EXECUTOR'S ACCOUNTS.

1. An account filed by an executor, which purports a partial distribution of the proceeds of sales and of rents collected among *creditors* of the succession he is administering, when duly homologated according to law, after due publication, is final and conclusive as to all the world—*heirs* as well as *creditors*—in respect to the *amount and validity* of the claims opposed; and, as to *heirs as well as creditors*, such judgment of homologation constitutes *res adjudicata* in respect to the *amount and validity* of said claims—though they have not been personally cited.

2. But, in respect to the *payment* of such claims—a condition subsequent to judg-ment—an account approved and homologated, constitues only *prima facie* evi-dence of payment, subject to attack by heirs or creditors in a direct action.

APPEAL from the Twenty-first District Court Parish, of St. Martin. *Mouton, J.*

*Gibson & Hall* for the Executor, Appellee:

An executor's account that has had due public advertisement of its filing and has been duly homologated, by final judgment, for more than ten years, is binding upon an heir not legally notified of such filing when that heir is a legatee. C C. Such judgment is *res adjudicata* as to him. 29 An. 378; Suc. Bougere, 10 R. 118; Suc. Peytavin, 6 L. 223; O. C. 1064 (1057); 15 An. 678; 18 An. 263.

When such heir, also a legatee, has managed much of the active business of a suc-cession, by collecting and distributing or retaining the rents collected, has authorized a compromise of a large claim against the succession by the execu-tor, and has mortgaged his interest in the succession several times, and the evidence shows familiarity with the executor's acts, it is ample ratification of the executor's account, filed and homologated years before, though he was not legally notified when it was filed. Such conduct amounts to both ratification and acquiescence by the heir as to the executor's account. 10 R. 118; 29 An. 378; 6 L. 223; O. C. 1064 (1057); 15 An. 678; 18 An. 263.

Rents can not be recovered when sued for and no contract of lease is proven or admitted. 23 An. 150; 38 An. 611; 33 An. 297; 39 An. 291.

An under-tutor can legally purchase the claims against the insolvent estate of his. wards. C. O., Under-tutor.

*Farrar, Jonas & Kruttschnitt* and *T. D. Foster* for Opponents and
    Appellants:

1.  This brief consists almost exclusively of a discussion of questions of fact, and
    it is, therefore, impossible to give any syllabus which will present any fair idea
    of the issues involved. We give a syllabus as to law points. A syllabus as to
    the questions of fact would be as long as the brief itself.
2.  The heirs of Mrs. Mary C. Conrad are not bound by the account of 1876, referred
    to by the executor as *res judicata*, because an heir is not bound by an account of
    an executor or administrator, unless he be notified of the filing of the same and
    cited to oppose it. The notice by publication binds creditors only; not heirs
    See Succession of Yarborough, 16 An. 258; Truxillo vs. Truxillo, 11 An. 412; Mil-
    ler vs. Rougieux, 20 An. 579.
3.  A joint owner or executor owes rent of property occupied by him. See 30 An
    438; 27 An. 547.
4.  An executor occupies a fiduciary relation to heirs. He can, therefore, make no
    profit out of any transaction with the creditors of the estate, and to the detri-
    ment of the heirs. If he buys up claims against the estate, he will be held to
    have made the purchase as an agent, and for account of the heirs, his princi-
    pals, and not for his own individual account. *A fortiori* is this the case where,
    at the time of the purchase, his pockets are full of the money of the succession.
5.  Compensation can not be pleaded by even such a fiduciary as a factor against
    his client.
    Compensation is an equitable defence, and can be set up only where it is con-
    sistent with the utmost good faith.
    Can it then be pleaded by an executor buying up claims at ten cents on the
    dollar with an heir's money, against that heir, when called on to account?

---

The opinion of the court was delivered by

WATKINS, J. This cause comes before us upon an account filed in
said succession by William F. Weeks, executor, and several supple-
mental accounts, and sundry oppositions thereto, on the part of
heirs and legatees.

Decedent first married David Weeks, of which marriage there
were six children, all of whom were minors, at time of his death
in 1834.

She, subsequently, married John Moore, but of that marriage there
was no issue. In 1863 she died testate, leaving four children sur-
viving her, namely, William F., Alfred C., Charles C., and Harriet
C. Weeks; having appointed her eldest son, William F., and her
surviving husband, joint co-executors.

Both executors qualified, but Moore died in 1867, prior to the filing
of any account of administration—he having managed the affairs of
the succession, chiefly, during his lifetime.

On the 19th of July, 1876, Weeks, executor, filed an account, and,

no opposition thereto having been filed, it was homologated, unqual-ifiedly.

Matters remained *in statu quo*, until 1887 and 1888, when other accounts were filed, and oppositions urged. They embraced very nearly all the items that appear upon all the accounts; but the homologated account of 1876 was assailed, particularly, on the ground that the judgment of homologation was an absolute nullity, because *personal* notices of its filing had not been given to the heirs. It is by C. C. Weeks, a brother of the executor, and Miss Fannie Weeks, daughter of Alfred C. Weeks, another brother, that this complaint is made—the interest of the former, nominally, being one-fourth as heir, and one-tenth as a legatee; and that of the lat-ter being one-eighth of one-fourth, as heir. In point of fact, the interest of C. C. Weeks is, at present, much less than as stated, as he has disposed of a large part of his share as heir; especially in the realty of the succession. The judge *a quo* maintained the validity of the judgment of homologation of 1876, approved all the various accounts since filed, and homologated them—only reducing the claim of West and Villeré by one-half, that is to say by the sum of $4907.12.

It is from that judgment that opponents have appealed.

In this court accountant requests an amendment of the judgment, so as to reinstate the claim of West and Villeré; and opponents opposed the bar of prescription of one, three, five and ten years, against all items of indebtedness on the several accounts.

## I.

With regard to the question of *res adjudicata* and estoppel, which are preliminarily raised, as stated above, the following statement of facts may be made, namely:

On the face of the account (of 1876) it sufficiently appears that it deals with debts of the deceased and his succession exclusively, and did not purport to marshal funds and assets of the estate for distri-bution among its heirs.

Notice of its filing was not given otherwise than by advertisement; and, no opposition having been filed, it was unqualifiedly homolo-gated on the 11th of August, 1876.

The account, however, contains this reservation, viz.: "The claims of West and Villeré, heirs of Coneaud, and Abat and Generes, carried

on this account, shall, after homologation of said account, be subject to future settlement between the heirs of Mary C. Moore, but exclusively as between those heirs.''

The account is not predicated upon succession inventories, but upon proceeds of sales of real estate and upon rents collected. It is with such items alone that he debits himself. And, on the other hand, he credits himself with amounts he claims to have expended in the settlement of debts, such as costs, taxes, counsel fees and mercantile accounts—those above enumerated amongst the number—showing an expenditure by the executor of $21,814 in excess of amounts received.

The account being regular in form, and the judgment of court having unreservedly homologated it, the question for decision is, whether the *heirs* and *legatees* can *collaterally* assail the validity of that judgment on the ground that they were not notified of the filing *personally;* or can the executor shield it from attack by interposing the bar of *res adjudicata.* The code declares that '' after the sale of the effects of the succession  *  *  *  the administrator *shall render* his account to the judge  *  *  *  whose duty it is to examine and correct, and approve the same,'' etc. R. C. C. 1063, 1180.

''The judge, on demand of the administrator, *shall order* that the creditors and legatees of the succession be notified to show cause  *  *  *  why they should not be paid conformably with the authorization, by the administrator.'' (Italics ours.) R. C. C. 1064.

This notice must ''be made by publication in the manner required for judicial advertisements,'' etc. R. C. C. 1184. ''If, in ten days after this notice, there is no opposition on the part of the creditors or legatees *the administrator shall proceed to the payment* in accordance with the authorization by him obtained  *  *  *  and which the judge shall cause to be homologated.'' R. C. C. 1065, 1185. '' If, on the contrary, there is any opposition the judge shall decide thereon in a summary manner; but if his decree be appealed from the administrator can make no payment until final judgment be rendered thereon.'' R. C. C. 1066, 1186, 1187; C. P. 988.

Upon casual inspection of the account, and the judgment of homologation under consideration, it is apparent that there is thereupon raised such a legal presumption as '' the law attributes to the thing adjudged'' (R. C. C. 2285), particularly when construed with reference to the precepts just enumerated—an executor possessing the

powers, and having imposed on him the duties, of an administrator. R. C. C. 1670.

The executor, acting on the line of his duty, rendered an account to the judge of the proceeds of sales he had made and of rents he had collected; and thereupon the judge caused the creditors and legatees to be duly notified conformably to the authorization solicited, and, there having been no opposition filed, he homologated the account, and required him to make payments of the claims of creditors accordingly.

As a corollary of the foregoing precepts the code further declares that, "when, after payment has thus been made, new creditors present themselves * * * (and) there be not funds sufficient to pay them in the hands of the administrator," they have their action (1) against the *legatees* and (2) against the *creditors* who have been paid, "to oblige them to make up to them a sum equal to that which (they) would have received had they presented themselves before;" but it further declares that such creditors "have *no right to sue the administrator* who has made the payment by order of the court and according to the forms herein prescribed." R. C. C. 1067.

The foregoing articles indicate the course of proceedings to be taken in the judicial ascertainment and settlement of the *claims of creditors against the succession;* and it is a noteworthy fact that the compilers of the code .thought proper to interpose the shield of that article, as a protection to a succession representative making payment of debts of the deceased on the judge's authorization.

But the settlement between such representative and the *heirs* of the estate is a totally different thing; for the code declares that "the duties of the curators cease when the heirs or other persons having a right to the succession administered by them *present* themselves * * * to claim the succession," etc. R. C. C. 1192.

"As soon as the heirs * * * have thus been put into possession of the succession or of the effects claimed by him *the curator is bound to render a faithful and exact account of his administration to him* (them) and pay the balance due," etc. R. C. C. 1194.

As construed by decisions and interpreted by comparative provisions of the code such claim can not be made until succession debts, as well as those of the deceased, have been liquidated and settled, unless the heirs elect to assume liability therefor. R. C. C.

1012, 1671, 1673, 994, 996, 1002, 1003; C. P. 1000, 1003, 1012, and R. S., Secs. 3678, 1640; 25 An. 56; 30 An. 96; 34 An. 21; 26 An. 30.

When an executor or administrator files such a *final* account purporting a settlement with the *heirs* of the .estate and a distribution among them of the *net assets* of the succession which remains in his hands *after debts are paid, personal notice* of the filing thereof must be given to the *heirs*, otherwise a judgment homologating it would be of no avail.

But this final account does not in any manner disturb judgments homologating such account as the one under consideration—partaking, as it does, of the nature of partial distribution among creditors.

In taking possession of a succession as an inheritance the heir " binds himself to the payment of the succession debts and charges," at least to the extent of the value of " the effects which have fallen to him from the succession " (R. C. C. 1013), but such acceptance is an " act of ownership, which the person called to the succession can only do in quality of heir." R. C. C. 994.

Heirship is not a *new* title to the property of an estate, but the transmission of an old one by the demise of the ancestor. R. C. C. 940, 871, 874. These provisions of law were evidently intended to safeguard the interests of *creditors* against impairment by acceptance of the debtor's succession by the *heirs;* and they, likewise, clearly evince the intention of the law-maker to subordinate such acceptance to the *status quo* created by judgments homologating such accounts as that of 1876.

And it seems to follow as a necessary legal sequence, that, by ar heir's acceptance, he becomes quite as much bound by such judgments as the succession is.

It is quite true that the code requires that an administrator shall file his accounts annually, on pain of dismissal from office, and damages; and that a judgment homologating such an account shall " be *prima facie evidence, only,* of its correctness." R. C. C. 1191. But such account essentially differs from the character of account we are dealing with. The former is an account between the *administrator* and the *succession,* while the latter is one between the *creditors* and the succession. The *former* deals with *debtors* as well as *creditors*—receipts as well as expenditures—while the *latter* deals, alone, with the *proceeds* in the administrator's hands, and the rights of *creditors* thereon.

The evident purpose of the compilers of the code was to protect the rights of *creditors*, by giving to a judgment homologating *such* an account as that we are considering the force and effect of *res adjudicata*, barring subsequent inquiry into the *validity* of their claims, while it is equally clear that their purpose was *not* to preclude an inquiry into the *fact* of their payment, same being a *condition subsequent* to the judgment ordering their payment—though it was to impose upon an *heir* the burden of attacking and disproving payment.

If this were not true, the code would be inconsistent with itself, by requiring payment of debts to be made on the faith of such decree, and then sanctioning a subsequent collateral attack of *heirs* upon the *validity* of such claims; in declaring that an administrator making such payments on the judgment of court shall be exempt from suit by absent creditors, while holding him amenable to action by heirs; and, in declaring that an heir's acceptance of a succession binds him to the payment of succession debts, and at the same time permitting him to collaterally attack the *validity* of claims of creditors thus judicially established.

Surely no such inconsistency was contemplated. This interpretation is strictly conformable to judicial interpretation; and, in our opinion, it was correctly formulated by this court, speaking through Judge Martin, in *Millaudon* vs. Cojus, 6 La. 224, thus:

" The article of *the Louisiana Code* (R. C. C. 1184 [1172]) cited by appellee's counsel authorizes indeed the executor who desires authority of the Court of Probates to pay creditors to *call all persons concerned* to appear and file their opposition. *This may likely prevent an heir who has neglected to oppose payments to creditors to contest their legality;* but the article has no application to the case of an executor who seeks to distribute the net proceeds of an estate among the heirs; this must be done *vocatis vocandi*, and the persons concerned are not to be cited in the mode prescribed by Art. 1172, which must be restricted to cases in which *nothing is sought but the sanction of the court to the payment of creditors.*" (Italics are ours.)

That opinion is prefaced by the statement that " Millaudon, the assignee of the shares of two of the heirs, is appellant from the decree which homologates a tableau of distribution of the property of the two estates by Cojus, who was executor of both. The defendant claims a reversal of the decree, on a suggestion that it

was rendered without his having been cited "—thus making it an exact parallel to the instant case.

The question was again presented in Succession of Macarty, 3 An. 383, wherein it was decided that the court below had "properly opened the decree in so far as related to the distribution of the *net proceeds of the estate among the heirs* upon the ground that the appellant had not been cited, following the authority of Millaudon vs. Cojus, 6 La. 225." (Italics ours.)

And in Succession of Bougere, 29 An. 379, Manning, chief justice, said on the same subject:

"The code requires the judge to order, on demand of the administrator, that the creditors and legatees of the succession be notified to show cause within ten days why they should not be paid according to the tableau of distribution presented to him.   *   *   *   And in *Millaudon's* case it is said, *the published notice prevents an heir who has neglected to oppose payments to creditors from contradicting their validity.* 6 La. 225."

This interpretation was recognized and applied in Carter vs. McManus, 15 An. 676, in the following emphatic language, viz.:

It has been held that, *as between the heirs and the executor*, or administrator of an estate, the homologation of the *final* account is not binding on the *heirs* without citation or notice; but it has also been held that, *as between the heir and the creditor of the succession the homologation of the final account is binding without personal notice or citation.*"

See, to the same effect, Day's Succession, 2 An. 895. Counsel for opponents cite and rely upon Succession of Yarborough, 16 An. 258; Truxillo vs. Truxillo, 11 An. 412, and Miller vs. Rongeaux, 20 An. 577, as establishing a contrary doctrine; but a casual inspection of those cases, shows that they state exceptional facts which do not militate against the general principles just announced.

We have made careful investigation of the provisions of the codes and jurisprudence on the subject and have reached the conclusion that the judgment homologating an account, purporting to distribute proceeds among creditors, constitutes *res judicata*, in respect to the *validity* of their claims, notwithstanding that the *fact* of *their payment* is left *open to direct attack by heirs*, prior to final settlement of the succession.

## II.

The discussion necessarily recurs to the reservation in the account of 1876, which prefaces this opinion; and we are called upon to determine the true meaning and import of the statement that "the claims" of the creditors named, "shall, after homologation of said account, be subject to future settlement between the heirs of Mary C. Moore; but exclusively as between these heirs."

Inasmuch as the statement guardedly employs the phrase "after homologation of said account," it must be assumed to have been a perfect understanding between the executor and the heirs, that "*the future settlement between the heirs*" that was contemplated was to be predicated upon the judgment recognizing the *validity* of the claims of the creditors mentioned. Therefore, as matter of law, as well as of agreement, the *validity* of these claims may be accepted, without further question; and, as these various accounts and oppositions, when collectively considered, may be accepted and treated as a *final* account, we can only investigate the *fact* of payment having been properly made by the executor, as a condition precedent to *final* settlement of the succession.

As set out in the account of 1876 the claims that are covered by the reservation are as follows, viz.:

West and Villeré, $9814.24; Heirs of Coneaud, $12,093.33; Abat and Generes, $11,194.50; total, $33,102.07.

From a careful scrutiny of the evidence in the record—which is exceedingly voluminous—there is no room to doubt that the executor and accountant has paid the foregoing claims; that in so doing he acted upon the advice and with the sanction of, at least, a portion of the heirs. That, in one instance, the opponent, C. C. Weeks, gave his written approval of the proposed compromise of one of these claims, and the compromise thereof, as made, resulted in large gain to the succession.

The only proof in the least militating against the claim of either of them is in respect to that of West and Villeré, and the sole objection is that the succession is only responsible for one-half thereof, z.: $4907.12.

This position is sustained by evidence showing it to have been a partnership liability for only one-half, of which Mrs. Moore was responsible. The judge *a quo* entertained this view, and so framed his judgment, and we concur in his finding.

7*

But, independently of the evidence referred to, the opponent, C. C. Weeks, insists that even conceding the correctness of the afore-said items and the *fact* of their payment by the executor, yet he is, not personally bound as an heir or legatee for their payment by rea-son of the express terms and conditions of a written contract between himself and the executor, William F. Weeks, made in 1871, several years prior to the filing of the account of 1876.

The contract referred to was offered in evidence by the executor himself, on the trial of the oppositions; and it appears to be an act of sale wherein Charles C. Weeks conveys to his brother, William F. Weeks, " all of his rights, title, ownership and demand as an *heir* and legal representative of *his late mother*, Mrs. Mary Conrad, * * * *in and to the property* heretofore owned by his said mother and brother in common in the proportion of one undivided half to each;" and also his interest *therein* as legatee under his mother's will of one-tenth as an extra portion—said property being the *Grand Cote* plantation and adjoining lands.

The price and consideration paid was $10,000; but it is supple-mented by this important clause, which contains the stipulations which opponent's counsel particularly invoke in support of his alleged discharge from liability, viz.:

" It is well and expressly agreed and understood between said parties to this act that this sale and conveyance is a settlement be-tween them of all rights resulting on the part of Charles C. Weeks against said William F. Weeks from his working and carrying on said property, latterly as well as heretofore, disposing of the crops, etc., and of all remaining indebtedness to their mother for his purchase from her of one undivided half of the same, and on the part of said William F. Weeks against said Charles C. Weeks for any collation that he might have to make to the succession of their said mother, the said William F. Weeks hereby giving said Charles C. Weeks ac-quittance and discharge for any and all collations due to him as one of the heirs of the said succession. *That as between them this is a definite settlement of all accounts in reference to the said property.* That the said William F. Weeks has paid on said plantation and lands the sum of $28,814, of which the said succession is indebted one-half and he the other half. That in said half due by said suc-cession, the said Charles C. Weeks owes in proportion to his share in said succession, as mentioned above, the said William F. Weeks

hereby grants full release and acquittance to said Charles C. Weeks; of whatever share of said indebtedness may be due to him. *This act is intended and does operate as a cancellation of all debts due by said Charles C. Weeks for any of the causes above mentioned.* He, the said Charles C. Weeks, so far as his interests in and to said plantation are concerned, hereby subrogates his said brother, William F. Weeks, fully to all of said rights, and the *said William F. Weeks on his part hereby binds himself to hold him harmless from any accountability to the succession of their said mother in collations which may be due to him in collating.*"

The foregoing is a quotation from the brief of opponent's counsel (pp. 8, 9), and the italicised words are theirs.

When paraphrased this clause covers the following points, viz.:

1. A settlement of all claims of C. C. Weeks *against* W. F. Weeks resulting from the latter's management of said property and his disposition of crops raised thereon.

2. A settlement of all remaining indebtedness of W. F. Weeks *to* their mother for his purchase from her of an undivided one-half interest therein.

3. A settlement of all the demands and rights of W. F. Weeks *against* C. C. Weeks for collation in the succession of his mother.

4. A settlement of the demands of William F. Weeks *against* C. C. Weeks as heir and legatee on account of the payment made antecedently by W. F. Weeks of $28,814 *on said plantation.*

These are, as we interpret the agreement, the only four matters of settlement that were embraced in the act, and figure therein as forming a part of the consideration thereof.

But in order that assurance be made doubly sure, we quote the following extract from the brief of opponent's counsel for the purpose of exhibiting the error they have fallen into, viz.:

"The document 'A,' to which we have above referred, specifically protected Charles C. Weeks against any indebtedness of the Grand Cote plantation, or in other words, the planting partnership of William F. Weeks & Co. It specifically protected Charles C. Weeks *against any debts paid prior to the date of the act,* and which upon its face were stated to exceed $28,000 in amount; and it also protected him from ever being called upon by the executor to pay anything whatsoever on account of the indebtedness of that plantation" p. 11.

The italicised words, "against *any* debts paid prior to the date of the act," are controlled and governed by the words of the act, viz.: "that the said William F. Weeks *has paid on said plantation and lands* the sum of $28,814," etc.

And to put the matter beyond doubt, and clearly show that the three claims under discussion were not included, the further statement of opponent's counsel made in brief (pp. 12, 13) will attest; for he says that the West and Villeré notes " show upon their face that they were notes of W. F. Weeks & Co., which, as already stated, was a planting partnership, composed of W. F. Weeks and of his mother," and were, therefore, chargeable jointly—*i. e.*, one-half to the succession.

And of the other two claims he says:

"No detailed evidence is given anywhere to show any further payments on these notes; but the executor, in his testimony, says that the whole amount of $11,194.50 was paid by him; that he presumed that all these notes paid to the heirs of Coneaud and to Abat and Generes were notes given by C. C. Weeks in purchase of the *Goodloe* property, and which notes were afterward assumed by Mrs. Moore as part of the purchase price of *said* property purchased by her from C. C. Weeks."

But it is further contended on the part of opponent's counsel that " if this statement be correct as to the notes of Abat and Generes, then William F. Weeks, himself, subsequently assumed payment of half of them," and refers, in confirmation of that statement, to an act of sale from Mrs. Mary C. Moore to Wm. F. Weeks, of an interest in *Grand Cote* plantation. Reference to the ـct in question fails to convince us of its correctness. There is this recital in that act, viz.:

" And for the balance of $6666.66 the purchaser promises and binds himself to pay one-half of two several promissory notes drawn *by* Paul Goodloe, payable respectively on the 1st of January, 1861 and 1862, to the order of James Looke * * dated January 11, 1859, * * and to secure the payment of which the property is mortgaged in the act of sale *from* Charles C. Weeks."

In other words, when C. C. Weeks purchased the *Goodloe* plantation he *executed* the notes which were presented to the executor by the heirs of Coneaud and Abat and Generes; and when W. F. Weeks purchased an interest in the *Grand Cote* plantation from Mrs. Moore,

Succession of Conrad.

he, in part payment, *assumed* one-half of two notes *drawn by Paul Goodloe and payable to the order of James Looke*, the payment of which is secured in an act of sale *from* C. C. Weeks.

The act in question fails to confirm the alleged assumption of said indebtedness by W. F. Weeks, and this ground of opponent's resistance must fail; and the district judge correctly so decided.

### III.

With regard to opponent's objections to the allowance made in the original account of 1888, for the fees of counsel, little need be said, as they principally relate to the fee of $2500 allowed Breaux & Renoudet—amounts paid to others seeming to have been acquiesced in, except with regard to some unimportant particulars needing no mention.

Opponent's counsel make this statement in their brief, viz.:

" We need not dispute the fact that Messrs. Breaux & Renoudet have had a great deal of work to do in connection with the filing of the various accounts presented by them, but this work had to be done on account of the carelessness and utter want of system displayed by the executor himself, in his gestion. It was necessary to file five or six accounts, simply because the executor did not furnish his counsel with the necessary information as to the payments claimed by him to have been made for account of the estate. With all of these services, the estate proper has nothing to do. William F. Weeks, individually, undoubtedly owes a large bill for counsel fees, and is abundantly able to pay the same, but we submit that as to the succession, the filing of an account showing no collections whatever, and merely making claims upon the estate in behalf of the executor, entitles the counsel for the accountant to naught but a nominal compensation from the estate, and we, therefore, submit that this item should be reduced to a sum not exceeding $500,— in so far as the estate is concerned."

We are not aware that from the simple fact that an account of administration shows no *collections*, and only shows *disbursements*, that the attorneys preparing and filing same should be entitled to nothing save *nominal* fees for their services. The principal part of an attorney's duties in the settlement of successions consists in the preparation and statement of the account.

This succession is a large one, the amounts paid creditors are

numerous and large, and the record covers over 700 pages.    Nearly thirty years have expired since decedent's succession was opened; and on account of the numerous dealings on the part of heirs—and conspicuously amongst them the opponent, C. C. Weeks—in making sales of and executing mortgages on succession property, and in otherwise making use of it as owners, an almost indefinite number of complications have arisen, which were tedious and difficult to state as well as to decide.

After a painstaking and careful investigation of the various accounts, and the labor and time counsel are shown to have bestowed upon them, the district judge approved the accounts as rendered, and the reasons assigned are not sufficient to authorize the amendment we are requested to make in his decree.

IV.

Inasmuch as the various pleas of prescription are urged as matters of defence in the oppositions as well as in an assignment in this court they may as well be disposed of preliminarily.

As above stated, this succession has been allowed by the *heirs* to remain under administration for a great many years—for a very much longer time than seems necessary.

All the pressing debts of the deceased have long since been paid; and the heirs have, for many years—for the most part at least—been in the actual enjoyment of the estate as an inheritance.    Most all of the claims that figure on the accounts are charges against the heirs by the executor for the reimbursement of moneys he has expended for taxes paid upon the common property and other expenditures made in the course of his administration and care of the property.    The only prescription applicable to such a demand is that of ten years against a *personal* action; and as these expenditures were principally made since the homologation of the 1876 account, only those of 1877 and part of 1888 could come within its grasp.

While there may be some items that may be apparently prescribed, there is nothing in the record or in the brief of opponent's counsel to found an intelligent judgment upon in this regard.    And inasmuch as the plea of prescription is an ungracious one, and the party urging it must make his claim to relief certain, we think it our duty to reject it *in toto*.

## V.

It is alleged in the oppositions and in the brief of counsel that sev-eral small items have been inadvertently duplicated and charged twice. This objection is particularly urged against the fees of Conrad & Son that are charged upon the first supplemental account of 1888; but, as we understand the evidence, this is not the case—the two separate and distinct charges being made for separate and different services rendered.

A similar complaint is made in reference to a charge in the second supplemental account for an amount paid Gall & Riggs of $336.20, as being a duplicate of an item placed on the account of 1876.

The item objected to in the 1888 account is—namely: " Amount paid to Gall & Riggs   *   *   *   a note bearing date   *   *   * $336.20;" while that occurring on the 1876 account is " to Gall & Riggs *on account and note,* $163.10.".

The voucher in the record is a note for $336.20, payable to the order of Gall & Riggs, of date April 29, 1867, on which there was $60 paid, on the 27th of June, 1868, leaving a balance due of $276.20, for which a new note was given.

The brief of opponent does not explain in what manner, or at what time, that note was partially paid and reduced to $163.10, as stated in the account of 1886; nor do they explain why that claim was, at that time, stated as an *account and note.*

While it must be confessed that there are some indications of the two items being the same, yet there is nothing *convincing* to that effect; and we are not authorized to rest our judgment upon a simple conjecture.

## VI.

The opponents urge numerous objections to various items of credit claimed by the executor for taxes paid, but it is quite impossible to state or discuss them in detail.

We find in the record vouchers for all the payments which are objected to; indeed, they are referred to in brief and opposition by number and without any question as to their being correct in amount. The only confusion there seems to be in the matter is that the taxes were paid by the executor upon various pieces of property for a period of twenty-five or thirty years, and he obtained from the collectors of taxes such receipts as were prescribed by *then existing laws.*

During this period the heirs dealt with the various properties of the estate as their own, by making sales and transfers of parts of some and undivided interests in others, and that some confusion should have resulted therefrom is not surprising, and for which the opponents are quite as much at fault as the executor was. Consequently we think that, as a matter of justice, the loss sustained by the mutual fault of opponents and of the executor should not fall upon the latter alone—even conceding that errors have been shown, which is very doubtful. The executor appears to have acted intelligently and with care; and he has evidently expended the *amounts* for which he claimed reimbursement; and in approving his accounts, in this respect, the judge *a quo* has done substantial justice in our opinion.

### VII.

With regard to the question of rentals opponent alleges that " the executor is singularly unsatisfactory;" but the difference between the executor's account and opponent's demand is quite small, indeed. The account admits the collection of $350 in rents since the filing of the account of 1876, and these were collected of the tenants of a small building in the town of New Iberia, which was occupied a portion of the time at $10 per month; and those of another building called the *Smith House,* yielding similar revenue, and some collected of the tenants of the property situated opposite New Iberia, at the rate of $50 per annum.

After summing up the evidence on this question counsel for opponents concludes his statement in his brief thus:

" It will thus be seen that we have actually and specifically proved receipts of rents amounting to $563 since 1876, instead of $350," from the three properties just mentioned.

When we take into consideration the fact that a period of *twelve years* intervened between the filing of the account of 1876 and that of 1888, within which this sum accumulated, we must confess our surprise that so much stress is laid upon an *alleged* difference of only $213 on all these rentals.

His further insistence is, that from September, 1883, to March 1887, C. C. Weeks, opponent, collected rents of the same property, aggregating $880, or $250 per annum, and, consequently, the executor should be charged at that rate per annum from 1876 to 1887. He further states in his brief:

"The executor's account of 1876, also, shows that he collected $2650 up to the filing of his account in 1876. These collections were made in a period of about ten years, and would show a rent value about the same as the amounts collected by C. C. Weeks. We think we may, therefore, fairly claim that the executor should be compelled to pay a rent value of $250 per annum upon the property from July 16, 1876, when he filed his first account, up to the date of the filing of his second account, August, 1888, say twelve years and one month, at $250 per annum, (which) equals $3020."

But counsel further states:

" On the other hand, we must, of course, admit that C. C. Weeks collected rents from September 19, 1883, to March 1, 1887, amounting to $1121.25, whereof he paid, by instructions of the executor, the sum of $466.50 to Mr. A. C. Weightman, one of his co-heirs, *and kept $654.75*, with which he *is to be debited* on his settling his account." Brief, pp. 28 and 29.

In the first place, there is nothing before us to show on what particular property the executor collected the rents that are placed on his 1876 account, nor any of the particulars, of amount per acre, or price per month, or per annum, on which to base a reasonable argument or make a calculation. This analogy is drawn from inference only.

But if it was a correct foundation for a decree, the fact of one of the opponents having been personally in charge of the collection of these rents for years, and, confessedly, in possession of a considerable sum that is yet unaccounted for, deprives his complaint of all equity.

## VIII.

There is one item of credit to which opponents are entitled, and which was inadvertently omitted from the account; and it is the sum of $1033.08, which represents the purchase price of the Gonsoulin and Hebert lot. And to this we will add the amount of $466.50 that C. C. Weeks sent to Mrs. Weightman—the two items aggregating $1499.58. The executor should be charged with these two items and his account of 1888 amended accordingly.

## IX.

With regard to the opposition of Miss Fannie Weeks, argument is presented to the effect that she occupies a more favorable position in

this litigation than C. C. Weeks does, because of the contract of sale from C. C. Weeks to W. F. Weeks, which has already been referred to and discussed.

This argument lacks foundation in point of fact; and if it had any, it would be of no avail, because, in respect of C. C. Weeks, we have ascertained and decided that it was of no value, and had no practical effect, or bearing on this controversy. Hence, the comparison made by opponents between the respective situations of C. C. Weeks and Miss Fannie Weeks is not apparent.

On this hypothesis it is quite unnecessary for us to follow counsel in his discussion of the settlement of the succession of Alfred C. Weeks, by Wm. F. Weeks. That can only be considered in any collateral bearing it may have on the instant case. Suffice it to say that Alfred C. Weeks died apparently insolvent, and that Wm. F. Weeks paid his debts, whether by compromise or otherwise is immaterial to this case. The result was that the interest of A. C. Weeks in the succession of his mother, Mrs. Moore, except that of Miss Fannie Weeks, was sold at public auction and the proceeds absorbed. These are all accomplished facts, and must remain *in statu quo* until set aside in due course of law. On the face of the records, there is nothing remaining due to Alfred C. Weeks' succession, or heirs, save the *claim* of Miss Fannie Weeks, and it is manifestly so burdened by her deceased father's indebtedness that her claim is unimportant. But, in any event, she occupies identically the same relation to *this* succession as her uncle, C. C. Weeks, does.

After a patient examination of the record, we are satisfied that the judgment of the District Court does substantial justice; but it needs one amendment—that is, by the addition of the two items above mentioned, aggregating $1499.58, as an additional debit against the executor.

It is therefore ordered, adjudged and decreed that the judgment appealed from be so amended as to increase the accountant's debit by fourteen hundred and ninety-nine and 58-100 ($1499.58) dollars; and that as thus amended the same be affirmed, and that the cost of appeal be taxed against the executor and appellee.

The Chief Justice takes no part, not being present at the argument, and Mr. Justice Breaux recuses himself, having been of counsel.

ON APPLICATION FOR REHEARING.

WATKINS, J.   (a) Executor's counsel complains of our opinion
only in two respects, viz.:

1. In that we erroneously amended the judgment of homologation
of the executor's account by allowing opponents an additional debit
of $1033.08 as the amount collected from Gonsoulin & Hebert as pro-
ceeds of their mortgage note.

2. In that the executor is likewise debited with $466.50 as the
amount C. C. Weeks paid one of the heirs out of rents he had col-
lected.

Our attention is called to the terms of the judgment, whereby it is
made  apparent that the first sum  was  debited to  the  executor
therein, and consequently our decree was in error in giving this
amount as an increased allowance and in this respect the applica-
tion should prevail.   This is a mere *casus omissus*, and was occasioned
by an improper construction of a statement found in the brief of the
executor's counsel (at page 33) admitting that the account should be
thus credited.

But in respect to the further debit that is complained of we are of
opinion that complaint is not founded, particularly in view of the fact
that on the same page of the brief is found an implied admission of
the correctness of this charge.

(b) Opponent's counsel enumerate in their brief quite a variety
of objections to our opinion, which is tantamount to a reargument of
the whole case.   But there is only one that strikes us as requiring
special answer, because his argument is predicated upon the assump-
tion that the propositions of law that are announced are correct.
Such being the case, the homologated account of 1876 stands unim-
peached and can not be assailed, and all the items and amounts
thereon placed are fully and conclusively established.   This leaves,
practically, little in the controversy for discussion; and upon the
remaining issues we are only the more confident of the correctness
of the conclusions arrived at by reason of a second examination of
them.

Counsel, however, insist that notwithstanding the district judge in
his reasons for judgment declared that the accountant was only
entitled to credit for one-half of the amount of the West & Villeré
claim that is carried on the account, yet the judgment he rendered
made no mention of this reduction and homologated the account as it

stood; and that in this manner the heirs are charged the *full amount* in error.

On *casual* inspection this statement appears to be correct; but on *careful* examination, and a comparison made of the reasons for judgment and the judgment itself, the difficulty is completely overcome. For it appears from the judgment that " the written reasons of the court were (thereto) annexed and form part of same." This being the case, other recitals in the decree, seemingly inconsistent therewith, must be constrned with and conformed to the reasons for judgment. On this theory our judgment is correct, and in this respect requires no amendment.

It is therefore ordered and decreed that our opinion and decree be so amended as to *disallow* the amendment in respect to the additional debit of $1033.08, and that in all other respects it remain undisturbed.

Rehearing refused.